**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 04a0096n.06
Filed: November 17, 2004

**No. 03-4029**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JAMEL LINDSEY,

      Defendant-Appellant.

_____/

**ON APPEAL** FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

**BEFORE:**    **COLE and ROGERS, Circuit Judges; COHN, District Judge**[*]

**AVERN COHN, District Judge.**  This is a criminal case.  Defendant-Appellant Jamel

Lindsey (Lindsey) appeals from the district court's denial of his motion to suppress

evidence related to his charge of being a felon in possession of a firearm under 18 U.S.C.

§ 922(g)(1).  Lindsey says that police officers violated the Fourth Amendment of the

United States Constitution because they lacked reasonable and articulable suspicion to

justify his seizure under *Terry v. Ohio*, 392 U.S. 1 (1968).  Lindsey says that the officers'

---

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District
of Michigan, sitting by designation.

actions constituted an arrest and thus required probable cause. The government says that the seizure was a valid *Terry* stop because Lindsey matched the description of a suspect wanted for a violent crime and the officers used reasonable precautions by approaching Lindsey with weapons drawn. We affirm.

## I. BACKGROUND

On November 2, 2002, East Cleveland, Ohio, police dispatcher LaShonda Lee received a 911 call from 1649 Bryn Mawr Road. The anonymous caller reported that someone had fired shots in front of an East Cleveland residence and that one man was down. Lee noted that the shooter was described as an African-American male wearing a black leather jacket and a black skull cap. Other witnesses subsequently called the police to report the incident, providing Lee with further information about the description of the jacket worn by one of the suspects and information about where the suspects had fled. Lee dispatched all available officers to the scene and told them that two male suspects were running down Hayden Avenue toward Eddy Road. She also gave the officers a description of one of the men. Officer Antonio Evans testified that he received a dispatch description that the suspect "was a dark-skinned black male wearing a black jacket with like white stripes, white lettering on the jacket." Lee's dispatch notes of the incident do not include any reference to white stripes, lettering, or fringe. She testified, however, that she might have said something when dispatching the officers that she did not write in her dispatch report.

On his way to the scene, Officer Evans saw a man matching the description of the

2

shooter running in the vicinity. Evans testified that the man stopped running when he saw Evans. Evans testified that he did not stop the man immediately because police dispatch had reported that one female officer had arrived at the scene and he did not want her to be alone and in a potentially dangerous situation. At the same time, other officers in the area were stopping people matching the description in an attempt to locate the shooter.

Once Evans arrived at the scene, witnesses told him that the shooter ran through a backyard and in the direction in which Evans had previously seen a man who stopped running when he saw Evans. Evans told Officer Terry Wheeler that he had seen a person who matched the suspect's description and suggested that they go investigate.

Evans and Wheeler drove separate cars to the area where Evans previously had seen a man matching the suspect's description. When they reached the area, Evans and Wheeler saw a man wearing a dark-colored New York Yankees bomber jacket with white letters walking down the street with a woman. Evans told Wheeler that this was the man he saw running earlier. The officers exited their cars, approached the man and woman with guns drawn, and ordered Lindsey and the woman to the ground. Both officers testified that Lindsey had blood on his hand from a cut that Lindsey said he received when he jumped over a fence.[1] Wheeler testified that he told Lindsey and the woman

---

[1] According to witnesses, the suspect had traveled through backyards and likely would have climbed over fences. Lindsey denies having a cut hand and denies any conversation took place about his hand. There is no reference to Lindsey's hand in the police report.

why they were being stopped and that he intended to frisk them.[2]  When Wheeler asked

Lindsey whether he had any weapons, Lindsey said that he had a gun in his pocket near

his belt.  Wheeler testified that he retrieved the loaded gun, handcuffed Lindsey, and

placed him under arrest.  During this incident, Wheeler found marijuana in Lindsey's

pocket and confiscated it.

Lindsey was indicted on one count of felony possession of a firearm under 18

U.S.C. § 922(g)(1).  He was arrested and arraigned and he subsequently filed a motion to

suppress evidence of the firearm, alleging that the search and seizure was unlawful under

the Fourth Amendment.  The district court conducted a suppression hearing that included

testimony from Lee, Lindsey, Evans, and Wheeler.  The district court denied the motion

from the bench.  The judge based his decision on the description and the location of the

suspect, which were close to what dispatcher Lee had reported.  The judge determined

that the stop was reasonable under the circumstances.

Thereafter, Lindsey pleaded guilty to possession of a firearm on the condition that

he would be free to appeal the denial of his motion to suppress.  This appeal followed.

---

[2] Lindsey testified that other officers arrived at the scene while he was lying face down and that the other officers told Evans and Wheeler that Lindsey was the wrong suspect and that they were on the wrong street.

## II. ANALYSIS

### A. Standard of Review

On review of the denial of a motion to suppress, this Court reviews a district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Nararro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). All evidence must be viewed "in the light most likely to support the district court's decision." *Id.*

### B. Whether Lindsey's Seizure Was a *Terry* Stop or an Arrest

The district court properly denied Lindsey's motion to suppress because the police officers conducted a valid *Terry* stop. The actions of the officers in approaching Lindsey with guns drawn, ordering him to the ground, and frisking him did not transform the *Terry* stop into an arrest; what they did was reasonable to protect the safety of the officers and the public given the violent nature of the crime.

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Under *Terry*, searches are permitted based upon less than probable cause when the purpose of the detention is investigative, the length of time is reasonable, and the scope is limited to alleviating suspicion. *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 124 S.Ct 2451, 2458 (2004). A search becomes a

5

seizure when the actions of police officers lead a reasonable person to believe that they are not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Such actions include the presence of several police officers, officers displaying a weapon, physical touching of the person, or "the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* In this case, a reasonable person would not have felt free to leave because two officers drew their guns and ordered Lindsey to the ground while one of the officers frisked Lindsey. Accordingly, the stop of Lindsey constituted a seizure.

"This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop." *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001). The Supreme Court has stated that police officers should not be "required to take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23. Indeed, police officers may use reasonable means to protect themselves when conducting a *Terry* stop, including drawing weapons if the officers believe the suspect may be armed. *United States v. Hardnett*, 804 F.2d 353, 357 (6th Cir. 1986). A seizure can, however, ripen into an arrest and thus require probable cause. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). Because there is no litmus test to determine whether an encounter with police officers is a *Terry* stop or an arrest, the court must examine the circumstances surrounding the stop to judge its reasonableness. *Florida v. Royer*, 460 U.S. 491, 506 (1983).

Lindsey claims that he was arrested when the officers approached him with guns

6

drawn and ordered him to the ground because he was not free to move or resist out of fear of being shot. Lindsey suggests that the Fourth Amendment precludes officers from drawing their guns before approaching people who have not taken any visibly threatening or suspicious actions toward the officers. Rather, he maintains, officers must have probable cause before approaching a person in that manner.

If police officers perform actions beyond those that are reasonably necessary to protect themselves during a stop, the encounter may ripen into an arrest. To determine whether a stop had ripened into an arrest, this Court examines whether the stop bears any indicia of an arrest, such as (1) transportation of the detainee to another location, (2) significant restraints on freedom of movement involving physical confinement or other coercion, (3) use of weapons or bodily force, and (4) whether officers have given *Miranda* warnings. *United States v. Lopez-Arias*, 344 F.3d 623, 627-28 (6th Cir. 2003). These factors, however, are not dispositive. In *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999), this Court upheld a stop by officers who responded to a radio dispatch report of a suspect who shot a police officer, even though the officers approached the suspects at gunpoint, handcuffed the suspects, placed them in separate squad cars, and held them for approximately twenty minutes after the time that they concluded that the shooting they were investigating had not actually occurred.

In this case, Evans and Wheeler were conducting an investigation of a shooting. The officers reasonably believed that approaching Lindsey with guns drawn was

7

necessary because Lindsey matched the description of a suspect who had just shot another person. Additionally, and significantly, the stop of Lindsey was brief and did not have other indicia of an arrest. Evans and Wheeler neither transported Lindsey to another location nor read *Miranda* rights. Although disputed by Lindsey, the officers also testified that they did not handcuff Lindsey until after Wheeler removed Lindsey's gun. Viewing this evidence in the light most likely to support the district court's decision, we must accept this version of the facts as correct. Lindsey's encounter with Evans and Wheeler was a *Terry* stop and not an arrest.

## C. Level of Suspicion Required to Justify Lindsey's Detention

Because the stop is governed by *Terry*, Evans and Wheeler needed reasonable suspicion to justify Lindsey's detention. Reasonable suspicion is a lower standard than probable cause and is defined as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry*, 392 U.S. at 21. The Court defers to the officer's inferences based on experience. *Id.* at 27. Lindsey says that police officers were conducting a "dragnet" of African-American men in the vicinity of the crime scene and did not have particularlized suspicion when they stopped Lindsey. As discussed below, however, Evans and Wheeler had specific and articulable facts to determine that Lindsey might have been involved in the shooting.

The district court held that (1) Lindsey's location, (2) officer testimony that Lindsey matched the description of the suspect given in Lee's dispatch, and (3) officer testimony that Lindsey was running in the vicinity of the alleged shooting were sufficient

8

reasons to justify Lindsey's detention. The district court was correct in concluding that Evans and Wheeler had reasonable suspicion to detain Lindsey.

With respect to Lindsey's location, Lee's dispatch indicated that two male suspects were running down Hayden Avenue toward Eddy Road. Witnesses at the scene told Evans that the shooter had traveled through a backyard and in the direction where Evans previously had seen Lindsey. Lindsey's location and the direction in which he was traveling were consistent with Lee's dispatch and the information witnesses at the scene gave Evans. Additionally, although disputed by Lindsey, Evans and Wheeler testified that Lindsey said he cut his hand while jumping over a fence – something consistent with flight through a backyard.

Although there are inconsistencies with respect to Lindsey's description and how it related to the description in Lee's dispatch, this further supports the officers' reasonable suspicion. Lee's dispatch record indicated the suspect was described as an African-American male wearing a dark-colored jacket. Lee also testified that she does not always include all information in her written dispatch report. Evans and Wheeler testified that they heard the suspect described as an African-American male wearing a black jacket with white lettering, fringe, or stripes. Lindsey was stopped less than a mile from the scene wearing a dark-colored New York Yankees bomber jacket with white lettering. Evans properly believed that Lindsey matched the description of the suspect. The fact that Lindsey testified that other officers at the scene told Evans and Wheeler that Lindsey was not the suspect because he was not wearing all black clothing is of no moment. The

9

district court could weigh Lindsey's testimony against that of Evans, Wheeler, and Lee and conclude that other testimony and evidence was more credible than Lindsey's testimony.

Finally, while the fact that Lindsey was running when Evans first saw him is not by itself indicative of wrongdoing, running can be suggestive of wrongdoing. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Lindsey was running away from the crime scene in a direction consistent with reports from Lee's dispatch and witnesses at the scene. Significantly, Lindsey stopped running when he saw Evans. It was reasonable to infer that such action is consistent with the flight of a suspect.

### III. CONCLUSION

The officers were investigating a shooting and had a reasonable fear that Lindsey may have been armed. Thus, it was reasonable for the officers to draw their weapons to protect themselves when they approached Lindsey. Additionally, the stop did not have any indicia of an arrest, such as transporting Lindsey from the scene, detaining him for a lengthy period, or reading *Miranda* rights. Accordingly, the officers' encounter with Lindsey constituted a *Terry* stop, not an arrest. The officers had reasonable suspicion to detain Lindsey based on Lindsey's location near the crime scene, the direction in which he was traveling, and his physical description, all of which were consistent with the police dispatch report and information from witnesses at the scene.

Accordingly, the district court's decision is AFFIRMED.